## CHARLES A. REED v. JESSE HUTTON AND ED. LONG.

Court En Banc.   May 28, 1925.

No petition for Certiorari was filed.

1. **Appeal and error. Appellate court does not weigh evidence.**
   The appellate court will not weigh the evidence to ascertain where the preponderance lies.

2. **Appeal and error. Assignment of error must be definite.**
   All assignments of error must comply with the Rules of Court and an assignment objecting to testimony of various witnesses not giving names or setting out pages of record will not be considered.

3. **False imprisonment. Private person who has arrested another for public offense is required to take him before a magistrate or deliver him to an officer promptly but failure to do so may be waived.**
   In an action for false imprisonment where private persons arrested another in connection with a murder where the party arrested was taken to another town at his request before being turned over to an officer and was then turned loose without asking to be taken before a magistrate, held to have waived the protection of section 7005, Shannon's Code, which provides a private person who has arrested another for a public offense shall, without unnecessary delay, take him before a magistrate or deliver him to an officer.

4. **Trial. Instructions. Failure to charge when not requested is not error.**
   In an action for false imprisonment where error was assigned for court's failure to give instructions, held mere omission in the court's charge is not reversible error in a civil case where no request for the proper instructions is made in the court below.

Appeal in Error from Circuit Court, Blount County; Hon. Sam C. Brown, Judge.

Affirmed.

Brown and Johnson, of Maryville, for appellant.

Kramer and Quinn, of Maryville, for appellee.

OWEN, J. The plaintiff Charles A. Reed has appealed from a judgment rendered against him in the circuit court of Blount county. Plaintiff instituted a suit for false imprisonment on February 18, 1924. He averred that on or about the 15th day of December, 1923, while he was going along Main street in Maryville, Tennessee, he was suddenly pounced upon by the defendants ordered to throw up his hands and told that he was under arrest by the defendants, who were unknown to the plaintiff at that time.

It is further averred that the plaintiff demanded that the defendants show their papers or authority for making the arrest and that they declined to do so, and as a result the plaintiff became greatly frightened and called upon bystanders to come to his assistance, but they declined to do so.

It is also averred that defendants took hold of plaintiff, put handcuffs on his wrists, placed him in an automobile, cursed him, and abused him, and finally drove him out of town for a mile or more and that all the while he was protesting their actions and demanding their authority and they would make no explanations, further than to say: "You know what for, you are the man that did that shooting."

It is further averred that after the defendants drove the plaintiff out of town a mile or more in an automobile that they returned with him and talked to the parties with whom the plaintiff claimed to have spent the night during which the shooting occurred and that they then took the handcuffs off the plaintiff and turned him loose without any further explanation.

It is further averred that the defendants were acting without authority and that they had no just cause or excuse for their actions, but that their conduct was wilful, malicious, wanton and unlawful, and that the plaintiff was thus deprived of his privilege as a free citizen, was humiliated and injured by the rough treatment and was under great fear and apprehension that he was being taken out for the purpose of being mobbed and was thus greatly injured physically, mentally and otherwise and that his character was injured.

The defendant filed three pleas. The first was a plea of not guilty, and by the second plea the defendants averred that shortly before the acts complained of in the declaration for the alleged false imprisonment that a very serious felony had been committed in Blount county, near Maryville; that the mansion or dwelling house of one

Luther Wells had been broken into in the nighttime by someone with an attempt to commit a felony, and immediately after said mansion house had been entered two other felonies had been committed in Blount county, to-wit: an assault was made feloniously and with malice aforethought upon Luther Wells and his wife, Ada Wells, with a pistol or gun with intent to kill and murder them, and that the defendants had reasonable cause for believing that the plaintiff had committed said felonies.

The plea further avers that the defendants, in attempting to arrest the plaintiff because of the matters aforesaid used no more force than was reasonably necessary in order to detain him and that after said arrest had been properly and legally made, and before there had been any reasonable delay in bringing the plaintiff before the magistrate, he voluntarily and of his own free will, accompanied the defendants to certain places and he was released at his own request and with his consent without being taken before the magistrate.

The third plea was the same in substance as the second plea, except the defendants alleged that they were officers.

The case was submitted to a jury and the jury returned a verdict in favor of the defendants. Plaintiff seasonably filed his motion for a new trial, containing a number of grounds. The same was overruled and disallowed, and he prayed and was granted an appeal to this court; perfected the same and had signed and filed a proper bill of exceptions and has assigned eleven errors in this court.

The first four errors are as follows: "First: There is no material evidence to support the verdict. Second: The preponderance is against the innocence of the defendants. Third: The Honorable Court erred in permitting the various witnesses to testify about the plaintiff being in an intoxicated state the day before the shooting of Wells. Fourth: The Honorable Court erred in charging the jury that if the defendants took hold of the plaintiff in a rude, violent, or angry manner for the purpose of getting him off the street and for that alone, that would be an assault and battery, and no damages could be given in the case."

The remaining assignments (from five to eleven, inclusive) complain of the court's failure to charge the jury;—for instance, the fifth assignment is, the court erred in not charging the jury that if the defendants did not take the plaintiff before a justice of the peace or some officer when they took charge of him, that the same would be false arrest and false imprisonment.

It appears that if any special requests were offered, they were not copied into the transcript. On page 158 of the transcript we find the following: "At the close of the charge, counsel for the plaintiff requested the court to further charge the jury as follows: (clerk

here copy in full all of the requests made by counsel for the plaintiff.)'' Following this instruction to the clerk to copy different requests made by counsel for the defendants, we find the following: ''The Court: I charge you further, gentlemen, in connection with what I have said: If you should believe that the plaintiff asked to be taken to Bungalowtown on account of a fear he was placed in, then you would not say that that was voluntary on his part, or if you should believe that it was on account of fear that he was taken to Bungalowtown, then the defendants would not be excused for not taking him without delay before a magistrate, or other officer. Take the case, gentlemen.'' Thereupon, the jury retired and after consideration brought in a verdict in favor of the defendants and against the plaintiff.''

The second assignment of error is overruled because this court does not weigh the evidence to ascertain where the preponderance lies, and this is not a criminal case.

As to the third error assigned, this alleged error does not comply with the rules of the court, in that it says the court erred in permitting various witnesses to testify as to the plaintiff being in an intoxicated condition shortly before the shooting of Wells and his wife. No certain witnesses are named who testified; no page of the record or transcript is cited referring this court to the testimony complained of.

Subsec. 3, Rule Fourteen of the Court of Civil Appeals, found in 148 Tenn., page 712 (which rule has been adopted by this court), is as follows: ''When the error alleged is to the admission or rejection of evidence, the specification shall quote the full substance of the evidence, admitted or rejected, with the citation of the record where the evidence and ruling may be found.''

This assignment is overruled.

As to whether or not there is evidence to sustain the verdict of the jury, we state the substance of the plaintiff's testimony, as follows:

On or about the 15th day of December, 1923, the plaintiff, Charles A. Reed, was, a short time after dark, going to his room in the Sam Houston Inn, a hotel in Maryville. On his way to his room he was stopped by the defendants in this cause, and they began questioning him as to where he had spent the night on a certain date. The plaintiff informed defendants that they could go to Sheriff McCampbell or Squire A. C. Brakebill, a justice of the peace, and find out from them as he had already explained to them. He further informed them that he was getting tired of being asked as to where he had spent the night, etc. The plaintiff started on to his room, but defendants grabbed him, on each side of him, and forced him to a closed car. They secured a pair of twisters and placed him in the car without notifying him who they were or as to what they were

going to do with him. The plaintiff cried out for help, holloed for the sheriff and others to come to his aid, as he did not know whether he was going to be taken out and mobbed or for some other purpose. The defendants took plaintiff to what is known as Bungalowtown, which is about a mile from the city of Maryville, and made inquiry there at the home of Mr. Gorley. The Gorley family was not at home, so defendants returned to Maryville, and after some delay in front of the county jail the plaintiff was released.

The defendants insist that they did not arrest the plaintiff, but if their conduct amounted to the imprisonment of the plaintiff the defendants had reasonable cause to believe that the plaintiff had committed two serious felonies shortly before they accosted him on Main Street in Maryville, Tennessee. It appears that one Luther Wells, a young man who had only been married a few months, and his wife, each being about nineteen years of age, had their home broken into one Sunday night about midnight. The guilty party attempted to assault Mrs. Wells, and in the defense, Wells and his wife were both shot. The marauder escaped. Wells shortly thereafter died. His wife, and widow, recovered and testified in this case.

On the afternoon before the shooting the defendant was seen in the vicinity of Wells' home. He was drinking or intoxicated. He accosted some ladies who were passing in automobiles, and on two occasions, after flagging the cars and getting them to slow down or stop, he attempted to get in the automobile with these ladies. He was an employee of the sheet mill, a concern connected with the aluminum plant that made metal sheeting. He showed up late on the Monday following for his work. The defendant Hutton had served as sheriff of Blount county for four years, and he had been a deputy sheriff for a number of years. At the time of this occurrence he was policeman in the town of Alcoa, which is an incorporated town that adjoins the corporation of Maryville. Defendant, Ed Long, was employed by the aluminum company in Alcoa. He had formerly been a policeman in the town of Maryville.

After this shooting of Wells and his wife, it appears that the citizens generally were much exercised over the outrage. These two defendants became interested in an effort to locate the man who had perpetrated these horrible crimes. They had learned from the description of the party who invaded the home of Mr. Wells that the height and complexion resembled that of the plaintiff. The plaintiff had also told some of the employees of the aluminum company that he had been accused of committing the crimes at Wells' home, and they had asked him could he prove an alibi during that Sunday night and he stated that he could part of the night. A day or two after the shooting it appears that the plaintiff took a suit of his

clothes to a cleaner in Maryville to have the same cleaned and pressed. The legs of the trousers to his suit had red clay and Spanish-needles on them at the time; that this red clay and Spanish needles were around and near the home of Wells. On Saturday night the two defendants, having the information related to, and in company with Monroe Wells, a brother of Luther Wells, who had been killed, stopped the plaintiff on the street; that the street was well lighted at the place where these two defendants and Monroe Wells met the plaintiff. Long, who had worked with the defendants, said:

"Neighbor, just a moment and you can pass on; Charlie, you know me; we have worked for the same man, Bob Hunter, and I asked him: Are you acquainted with the Chief of Alcoa, and I told him, we want to ask you a question or two and we don't want every one to know what is going on, and Charlie raised an argument? Q. After that you said: neighbor, just a moment and you can pass on, and you said: You know me, we have both worked under the same boss, what else was said? A. Then Charlie raised an argument. Q. How; what did he say? A. The first words Charlie said, before I asked him a question: "Oh God, don't accuse me of this Wells' shooting. Q. He said: Oh God, don't accuse me of this Wells' shooting? A. Yes, sir, those were the first words Charlie said, and started on. Q. In which direction did he start when he started? A. He started up the street toward the Hotel. Q. Toward the Sam Houston Inn? A. Yes, sir. Q. How far was it from there to the hotel? A. Just a few feet. Q. What did you do when he started on? A. When Charlie started on I caught him and said: We havn't asked you our questions, we are not through with you, yet, and I stopped him and asked him the first question, which was where he stayed at the night of the shooting at Wells'. Q. What answer did he make? A. Charlie said: I was in a house and well taken care of. I asked him where, and he didn't tell what house or where it was at or anything else. I asked him different times where he was at, and he started on the second time like he was going all the way, and I made a leap or two and caught Charlie. Q. What direction did he start the second time? A. Up the street the same way, and I caught him and held him, and then he began to scream and hollo."

The plaintiff then started to yell and hollo, or, as the witness, Monroe Wells, puts it: "He took a regular fit." The witness Monroe Wells, in describing this fit says that: "He went to holloing to God and to the sheriff, don't let them do me this way, and Oh God, I am not guilty and all like that. He was yelling as loud as he could." Describing Reed's conduct, the defendant Hutton says: Q. What was the nature of the holloing or yelling that he did; was it loud or boisterous? A. Yes, sir, you could hear him probably three or

four blocks.  Q. Were there many people on the street?  A. Yes, there were lots of people on the street that night, there generally is on Saturday nights.  Q. Was that in a well-lighted section, in the business district of Maryville?  A. Yes, sir.  Q. After he started this screaming and yelling, what did you people do?  A. We tried to get him to hush, as there wasn't any of us there that knew the cause of it; we were trying to talk to him privately so that no one else wouldn't know what we were talking to him about.  That was the way we were working at it.  Q. What caused other people to know that you were talking to him?  A. His holloing so loud.  I expect there were two or three hundred people gathered up before we got him in the car.  Q. After he started this holloing and trying to get away, what did you people do, and why?  A. We undertook to put him in the car and get him away from the crowd; we were going to talk to him.''

It further appears that after the plaintiff was put in the automobile he wanted to get away from the crowd that was forming, and we think the defendants wanted to get him away.  He stated to the defendants that if they would drive him to Bungalowtown and to the home of a family by the name of Gorley, (and sometimes in the record called Crowley), they would tell where he was the night of the shooting.  The plaintiff was driven to the Gorley home and it was ascertained that he spent the night with the Gorleys.  Thereupon he was brought back to where he had gotten in the car, and released.

From the time that the plaintiff got in the car until he returned was about twenty minutes.  It is the insistence of the defendants that the mere fact the defendants stopped to talk to the plaintiff and asked him some questions did not amount to false imprisonment, and that the fact that Ed Long took hold of the plaintiff would not of itself amount to false imprisonment, though it might have amounted to an assault and battery, and the plaintiff is not suing for an assault and battery; that the defendants were trying to talk to plaintiff, but he raised such a violent disturbance, they tried to prevent him from creating further excitement, and that some two or three hundred people gathered by the yelling or screaming of the plaintiff, and the defendants were undertaking to put him in a car so that they could get him away from the crowd and could talk to him quitely, and as soon as he reached the car the plaintiff suggested that the defendants take him to Bungalowtown.

The plaintiff's witness Bob Hatcher, the deputy sheriff, was attracted to the scene, and he testified that the plaintiff was holloing and yelling loudly.  The plaintiff testified that the defendants cursed him and abused him.  This the defendants denied.  Defendants further insist that as private citizens they had reason to believe that plaintiff had committed crimes in the Wells' home, and as private

citizens they had a right to arrest the plaintiff; and that by section 7002 of Shannon's Code, it is provided: "A private person may arrest another when a felony has been committed, and he has reasonable cause to believe that the person arrested committed it;" and while the law requires as shown by section 7005 of Shannon's Code that, "a private person who has arrested another for a public offense shall, without unnecessary delay, take him before a magistrate or deliver him to an officer," and that there was no unnecessary delay; that the defendants went to Bungalowtown to gain some information, at the request of plaintiff, and that this only took twenty minutes; that they were not acting with unnecessary delay, but when they got the information from the Gorley family, plaintiff was released, and there was no necessity of taking him (plaintiff) to the magistrate.

The failure of the defendants to take the plaintiff before a magistrate or deliver him to an officer after he asked them to accompany him to Bungalowtown was waived by him. His request to go there and his request for releasement upon the return amounted to a waiver of this right. "The duty of one making an arrest to take a prisoner before a proper magistrate may be waived by the prisoner, and if he is released without being brought before a magistrate at his own request, or with his consent, he cannot afterward attack the validity of the arrest for this cause." 11 R. C. L., 802.

"One arrested may excuse a delay in arraignment or in bringing him before the magistrate or other proper officer by his own conduct. So one may be precluded from basing an action of false imprisonment upon the fact that he was not brought before the proper magistrate or other judicial officer by his own conduct in securing his release." 25 Corpus Juris, 526.

We are of opinion that there is evidence to sustain the finding of the jury upon the question that was submitted to them, that plaintiff waived the right to be taken before a justice of the peace when he requested that they carry him to Bungalowtown, and he requested that he be released when he got back, and was released. Under all the facts, we are of the opinion that the defendants had reasonable cause to believe that this plaintiff was guilty, and in some way, from his acts and conduct, he was connected with this horrible crime; that when he was accosted upon the street and asked quitely certain questions, he made outcries and attracted a crowd. These defendants sought to get further information, and acceded to plaintiff's suggestion that they go with him to the place where he had spent the night during the night it was alleged that the crime was committed, and under all the facts the jury was warranted in returning the verdict it did return; and it results that the first assignment of error is overruled.

Learned counsel for the plaintiff cites no authorities in support of the fourth assignment of error, and this assignment fails to comply with the rules in regard to citing the record, and it is overruled.

As to the remaining assignments of error, mere omissions in the court's charge is not reversible error in a civil case where no request for the proper instructions is made in the court below. Railway Company v. Quinn, 88 Tenn., 321.

Mere meagerness in a charge is not ground for a reversal, unless the party complaining submits their additional request, which is declined by the court. Maxwell v. Hill, 89 Tenn., 584.

It results that all of the assignments of error are overruled and disallowed, and the judgment of the lower court is affirmed. The plaintiff and his sureties on appeal bond will pay the costs of the appeal. The costs of the lower court will be paid as adjudged by said court. Execution will issue accordingly.

All concurred except Clark, J., absent.